IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

WESLEY A. LIVINGSTON,            )
                                 )
        Plaintiff,               )
                                 )        No. 2:12-cv-00055
v.                               )
                                 )        Judge Nixon
CAROLYN COLVIN,                  )        Magistrate Judge Knowles
Commissioner of Social Security, )
                                 )
        Defendant.               )

## ORDER

Pending before the Court is Plaintiff Wesley A. Livingston's Motion for Judgment on the

Pleadings ("Motion") (Doc. No. 11), filed with a Memorandum in Support (Doc. No. 12).

Defendant Commissioner of Social Security ("Commissioner") filed a Response in Opposition to

Plaintiff's Motion. (Doc. No. 13.) Magistrate Judge Knowles issued a Report and

Recommendation ("Report"), recommending that Plaintiff's Motion be denied and the decision

of the Social Security Administration be affirmed. (Doc. No. 14 at 20.) Plaintiff timely filed an

Objection to the Report (Doc. No. 16), to which the Commissioner filed a Response (Doc. No.

17). For the reasons stated below, the Court **ADOPTS** the Report in its entirety and **DENIES**

Plaintiff's Motion.

## I.    FACTUAL BACKGROUND

Plaintiff protectively filed an Application for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") on January 27, 2009, at the age of thirty-three, alleging

disability since July 15, 2008, due to dwarfism, autism, and depression. (Tr. 51, 52, 124, 131,

176.) [1] Specifically, he claims that these conditions limit his ability to work because he has trouble reaching, gets frustrated, cannot control his temper, is not treated equally because of his stature, and experiences back and leg pain from work, driving, and having to sit on his legs because they cannot reach the ground. (Tr. 176.)

*A. Medical History*

On April 15, 1977, when Plaintiff was sixteen months old, Dr. Guillermo Wyld and Dr. Arthur F. Kohrman of the Pediatric Endocrine Clinic conducted a physical examination of Plaintiff and noted their "[f]indings may be consistent with achondroplasia [dwarfism] because of the disproportion between the lower and upper segment of the body." (Tr. 236.) On April 26, 1977, radiologist Dr. A.S. Mackenzie confirmed the existence of physical signs of achondroplasia. (Tr. 238.) On August 13, 1980, when Plaintiff was four and a half years old, Dr. R.A. Norum of the Henry Ford Hospital again confirmed physical signs of achondroplasia. (Tr. 229.)

In 1984, Plaintiff's elementary school referred him to Dr. Jack Pascoe of the Michigan State University Child Health Care Clinic, who reported that Plaintiff attended a learning disabilities class in kindergarten and first grade, but did not participate in the class in second grade "because his scores were too good." (Tr. 249.) Dr. Pascoe noted that Plaintiff had "[s]chool function problems with obvious neurodevelopmental delay," and suggested that he be evaluated for special education. (Tr. 251.)

In June 1994, when Plaintiff was in high school, school psychologist Barbara Sullivan, Ed. S., evaluated Plaintiff and reported multiple "characteristics of Autism Impairment," including: "Disturbance in the capacity to relate to people, events and objects"; "Disorder of

---

[1] An electronic copy of the administrative record is docketed at Doc. No. 9.

2

language, speech and meaningful communication"; "Insistence on sameness as shown by stereotyped play patterns, abnormal preoccupation, unusual fears and resistance to change"; and "Unusual or inconsistent response to one or more sensory stimuli: sight, hearing, taste and touch." (Tr. 266–67.) Ms. Sullivan estimated Plaintiff had the interpersonal skills of a six-year-old and the coping skills of a nine-year-old, and recommended that he be eligible for special education services, receive counseling to address "depression and feelings of unfair treatment," and obtain training in social and problem solving skills. (Tr. 264, 267.) She noted, however, that Plaintiff "is much higher functioning than most individuals with autism," and "his prognosis for the future may be fairly good when [Plaintiff] is an adult." (Tr. 267.)

Plaintiff visited Dr. James D. Balger, a physician in Michigan, four times between March 2000 and June 2004. (Tr. 285–86.) During his initial visit in March 2000, Dr. Balger noted Plaintiff had "been out of work for about a year and has become anxious once again." (Tr. 286.) In April 2000, Dr. Balger reported Plaintiff had "autism, high functioning[;] dwarfism[; and] problems with anxiety," and prescribed Paxil. (*Id.*) In July 2002, Plaintiff's mother reported to Dr. Balger that Plaintiff did not want to continue taking Paxil. (*Id.*) In May 2004, Dr. Balger diagnosed Plaintiff with depression and seasonal affective disorder,[2] and prescribed the generic form of Prozac. (Tr. 285.) In a follow up note in June 2004, Dr. Balger reported Plaintiff was "feeling better on the Prozac" and refilled his prescription for three months. (*Id.*)

On May 28, 2009, Stephen R. Hardison, M.A. conducted a consultative psychological examination of Plaintiff as part of Plaintiff's disability application. (Tr. 288–91.) His testing indicated that Plaintiff "functions within the low-average range intellectually," and that although Plaintiff alleged he suffered from autism, "he did not present with the symptoms to suggest that

---

[2] Dr. Balger diagnosed Plaintiff with "SAD," which the Court presumes to be seasonal affective disorder, given the psychological nature of Plaintiff's visits.

diagnosis at the time of this testing." (Tr. 291.) Mr. Hardison concluded Plaintiff was either not significantly limited or only "mildly" limited in the following areas: (1) ability to remember and carry out basic one and two-step instructions; (2) ability to remember and carry out somewhat more detailed instructions in a low stress environment; (3) ability to sustain concentration and persistence for extended periods of time in a structured routine setting; (4) ability to complete work tasks without interruption from psychologically-based symptoms; (5) ability to respond appropriately to changes in a routine work setting; and (6) ability to use appropriate judgment or make simple decisions in a routine setting. (*Id.*) He noted, however, that Plaintiff's "ability to interact appropriately with coworkers, supervisors, and general public could be mildly to possibly moderately limited at times based on some history of irritability." (*Id.*)

On July 9, 2009, Dr. Pilar Vargas conducted a mental residual functional capacity ("RFC") assessment based on a review of Plaintiff's medical records in connection with his disability application, concluding that Plaintiff's "mental impairments, at present, are of mild to moderate severity," and quoting records stating his "interaction[s with the] public should be infrequent and non-intensive," "feedback on work should be supportive and nonconfrontational," and "changes in work setting should be infrequent and gradual." (Tr. 304, 308.) On July 11, 2009, medical consultant Dr. James B. Millis completed a DDS Medical consultant analysis as part of Plaintiff's application for benefits and reported that Plaintiff's "[a]chondroplasia dwarfism is not expected to interfere with normal daily activities, and has not in the past limited [Plaintiff] from working and earning [substantial gainful activity]." (Tr. 313.) On September 11, 2009, medical consultant Edward L. Sachs, Ph.D. conducted a mental RFC assessment of Plaintiff as part of Plaintiff's application for benefits and found Plaintiff "can perform simple and

4

detailed tasks," "can interact infrequently or one to one with general public," and "can adapt to gradual or infrequent changes." (Tr. 316.)

### B. Work History

Plaintiff was most recently employed as a cook in a restaurant in Crossville, Tennessee, in July 2008. (Tr. 175, 289.) Plaintiff testified that he was fired after about a month because a coworker "started making accusations that [he] called her names." (Tr. 38, 289.) Before working at the restaurant, Plaintiff worked in a warehouse for ninety days. (Tr. 289.) Plaintiff told Mr. Hardison he was fired because "he had trouble with the boss." (*Id.*) However, Plaintiff subsequently testified he was sent home due to his personal hygiene and was not allowed back. (Tr. 40.) In his Disability Report, Plaintiff indicated he was temporarily employed with a distribution center in late 2007 and early 2008, but "the job ended." (Tr. 176–77.) In 2008, he worked at a restaurant "for one month but that job was only a temp job also." (Tr. 176.)

Plaintiff worked as an electrician's helper for over a year from 2006 to 2007, when he was terminated "due to lack of work," but he "reported generally getting along with coworkers and supervisors." (Tr. 37, 177, 289.) He testified that he did not ask for any special type of consideration or treatment to obtain the job as an electrician's helper and did not receive any special treatment during his employment. (Tr. 32–33.) Plaintiff's father testified that Plaintiff was able to obtain the job because a friend "put in a good word for him." (Tr. 43.) He also indicated Plaintiff had some emotional outbursts at work, but eventually his employers grew accustomed to his behavior. (Tr. 43–44.) Plaintiff's father added that, while working, Plaintiff was extremely sensitive to perceived criticism and was constantly worried about losing his job. (Tr. 44.) Additionally, since Plaintiff began living away from home, Plaintiff's father would have to calm him down over the phone when he would get upset at work. (*Id.*)

5

## C. Vocational Expert Testimony

At the hearing on August 12, 2010, Administrative Law Judge ("ALJ") Frank Letchworth heard testimony from Plaintiff, Plaintiff's father, and vocational expert ("VE") Julian Nadolsky. (Tr. 45–49.) ALJ Letchworth asked VE Nadolsky about two hypothetical claimants during the hearing. The ALJ's first hypothetical was a claimant with no exertional limitations, but who "is limited to performing no more than simple and low level detailed instructions, can have no more than occasional interaction with the public, will perform better in an object focused work setting than in a public setting, can adjust to occasional changes in work settings or routines," and has no past work experience. (Tr. 46–47.) VE Nadolsky answered that such a person could perform medium level, unskilled jobs such as conveyor feeder, packaging machine tender, and mold cleaner. (Tr. 47.) He testified that 800 such jobs exist in the local economy and 1.25 million exist nationwide. (*Id.*) The VE also explained that additional jobs exist that the person could perform at the light level. (*Id.*)

ALJ Letchworth then added to the previous hypothethical: "any supervision of the claimant must be direct and nonconfrontational [and] the claimant can perform no highly stressful production rate or quota jobs." (Tr. 48.) VE Nadolsky answered that he did not believe these additional limitations would affect his answer to the hypothetical, but noted that under these circumstances a claimant "might have some difficulty getting through the initial phase of the job because of the need for direct and nonconfrontational supervision." (*Id.*) The VE then clarified that there would be jobs that would accommodate the further requirement of direct and non-confrontational supervision, including the jobs already testified to (conveyor feeder, packaging machine tender, mold cleaner) and other jobs, such as hand sander, cushion stuffer,

furniture wiper, decal applier, and gasket inspector. (*Id.*) VE Nadolsky opined that 1,100 jobs exist at the light level in the local labor market and 1.5 million exist nationwide. (*Id.*)

## II. PROCEDURAL BACKGROUND

Plaintiff protectively filed his DIB and SSI applications on January 27, 2009. (Tr. 51, 52, 124, 131, 176.) The Social Security Administration ("SSA") denied Plaintiff's application initially (Tr. 51–52) and upon reconsideration (Tr. 53–54). On October 26, 2009, Plaintiff filed a written request for a hearing before an ALJ. (Tr. 71.) ALJ Letchworth conducted a hearing on August 12, 2010, receiving testimony from Plaintiff, VE Nadolsky, and Plaintiff's father, Michael Livingston. (Tr. 27–50.) On September 30, 2010, ALJ Letchworth issued an unfavorable decision, finding that Plaintiff was not disabled under the meaning of the Social Security Act. (Tr. 25.) Specifically, ALJ Letchworth made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since July 15, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: learning disorder; depression; and organic brain syndrome (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.929).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels

7

but with the following nonexertional limitations: He is limited to direct nonconfrontational supervision and to jobs that require no high stress production rates or quotas.

6. The claimant was born on December 20, 1975 and was 32 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, from July 15, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 20–25.)

On October 18, 2010, Plaintiff sought review of ALJ Letchworth's decision from the SSA Appeals Council. (Tr. 14.) On April 4, 2012, the SSA Appeals Council declined to review the ALJ's decision (Tr. 1), thereby rendering it the final decision of the Commissioner.

Plaintiff filed this action on June 1, 2012, to obtain judicial review of the Commissioner's final decision under 42 U.S.C. § 405(g). (Doc. No. 1.) Pursuant to Magistrate Judge Knowles's

order of October 19, 2012 (Doc. No. 10), Plaintiff filed a Motion for Judgment on the Record with a Memorandum in Support on November 19, 2012 (Doc. Nos. 11; 12). The Commissioner filed a Response on December 17, 2012. (Doc. No. 13.) Magistrate Judge Knowles issued the Report on July 18, 2013, recommending that Plaintiff's Motion be denied. (Doc. No. 14.)

Plaintiff timely filed an Objection to the Report on July 31, 2013, arguing that ALJ Letchworth's decision was not supported by substantial evidence and erred in relying on VE Nadolsky's testimony to conclude Plaintiff could maintain steady employment. (Doc. No. 16.) The Commissioner filed a Response to Plaintiff's Objection to the Report on August 8, 2013. (Doc. No. 17.)

## III.  STANDARD OF REVIEW

The Court's review of the Report is *de novo*. 28 U.S.C. § 636(b) (2012). However, this review is limited to "a determination of whether substantial evidence exists in the record to support the [Commissioner's] decision and to a review for any legal errors." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Title II of the Social Security Act provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g) (2012). Accordingly, if the Commissioner adopts the ALJ's decision, the reviewing court will uphold the decision if it is supported by substantial evidence. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Substantial evidence is a term of art and is defined as "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Comm'r of Soc. Sec.*, 105 F.3d 244, 245 (6th Cir. 1996) (citing *Consol. Edison*, 305 U.S. at 229).

"Where substantial evidence supports the Secretary's determination, it is conclusive, even if substantial evidence also supports the opposite conclusion." *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999). This standard of review is consistent with the well-settled rule that the reviewing court in a disability hearing appeal is not to weigh the evidence or make credibility determinations because these factual determinations are left to the ALJ and to the Commissioner. *Hogg v. Sullivan*, 987 F.2d 328, 331 (6th Cir. 1993); *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). Thus, even if the Court would have come to different factual conclusions as to Plaintiff's claim on the merits than those of the ALJ, the Commissioner's findings must be affirmed if they are supported by substantial evidence. *Hogg*, 987 F.2d at 331.

## IV. ALJ LETCHWORTH'S DECISION

To be eligible for DIB and SSI, a claimant has the ultimate burden to establish he or she is entitled to benefits by proving his or her

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A) (2012); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> 1. If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

10

2.  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3.  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[3] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4.  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity ("RFC") (e.g., what the claimant can still do despite his or her limitations); if the claimant has the RFC to do his or her past relevant work, the claimant is not disabled. If the claimant is not able to do any past relevant work or does not have any past relevant work, the analysis proceeds to step five.

5.  At the last step it must be determined whether the claimant is able to do any other work. At this step, the Commissioner must provide evidence of the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and RFC.

20 C.F.R. §§ 404.1520(a), 416.920(a) (2014); *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

Here, ALJ Letchworth found under the five-step analysis that (1) Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability; (2) Plaintiff's learning disorder, depression, and organic brain syndrome impairments are considered "severe"; (3) Plaintiff did not have an impairment that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) transferability of job skills is not material because Plaintiff is "not disabled"; and (5) considering Plaintiff's age, experience, and education, Plaintiff has the RFC to perform a full range of work at all exertional levels, but is limited to direct, non-confrontational supervision and to jobs that require no high-stress production rates or

---

[3] The Listing of Impairments is found at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2014).

quotas, and that a significant number of jobs exist in the national economy that Plaintiff can perform. (Tr. 20–25.) ALJ Letchworth concluded that Plaintiff had not been under a disability at any time through the date of his decision. (Tr. 25.)

## V.    OBJECTIONS

Plaintiff raises two objections to Magistrate Judge Knowles's Report. Plaintiff asserts that Magistrate Judge Knowles erred (1) in concluding that ALJ Letchworth's RFC finding was based on substantial evidence, and (2) in concluding that ALJ Letchworth properly relied on VE Nadolsky's testimony to determine that Plaintiff could maintain steady employment. (*Id.* at 3–8.) The Court addresses each objection in turn.

### A.  *ALJ Letchworth's RFC Finding*

As previously noted, ALJ Letchworth found Plaintiff's RFC was "limited to direct nonconfrontational supervision and to jobs that require no high stress production rates or quotas." (Tr. 21.) Plaintiff argues that the majority of the objective medical evidence in the record indicates he suffered from more substantial mental impairments than reflected in ALJ Letchworth's RFC determination. (Doc. No. 16 at 3–6.)

First, Plaintiff contends ALJ Letchworth improperly relied on the report of consultative psychological examiner Stephen Hardison, because Mr. Hardison's report is "contradicted by almost all of the other evidence of record." (*Id.* at 3–4.) Second, Plaintiff argues that the report of Ms. Sullivan, the school psychologist who "specifically found that [Plaintiff's] interpersonal skills were akin to those of a young child," indicates Plaintiff's RFC should reflect greater mental limitations than provided for by the ALJ. (*Id.* at 5.) Third, he claims his work history, which "shows him incapable of maintaining steady employment as a result of his impairments,"

and his father's testimony both reflect far greater limitations than accounted for in the ALJ's findings.[4]

Additionally, though Plaintiff admits that his own testimony suggests he was able to function socially at work, he asserts that ALJ Letchworth should not have found Plaintiff's testimony credible, given that his autism makes him an unreliable witness. (Doc. No. 16 at 4; 12 at 8.)

Residual Functional Capacity is defined as "the maximum degree to which the [claimant] retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c). The ALJ is required to base a claimant's RFC on all relevant evidence in the case record. 20 C.F.R. §§ 404.1545(a)(1), 416.945 (a)(1). The reviewing court will uphold the ALJ's RFC determination if it is supported by substantial evidence. *Garner*, 745 F.2d at 387.

Here, contrary to Plaintiff's assertion, ALJ Letchworth did not rely "primarily" on Mr. Hardison's report in assessing Plaintiff's RFC. First, ALJ Letchworth noted that the RFC he assessed is "consistent with the medical source statements of the State Agency psychologists who noted no more than mild to moderate mental limitations that were not so severe as to compel the claimant to seek professional mental health treatment or even to take prescribed anti-psychotic medications from a family physician." (Tr. 21–22.) The ALJ then referenced Mr. Hardison's evaluation: "Likewise, the consultative examiner did not find more than mild to moderate mental limitations and averred that [Plaintiff] was capable of performing even detailed-

---

[4] Plaintiff refers specifically to his father's testimony that, although Plaintiff worked for a year and a half as an electrician's helper, he "was accommodated by an extraordinarily lenient employer." (Doc. No. 16 at 5.) Additionally, Plaintiff contends his work history reflects that he "has been fired from several jobs for a plethora of reasons related to his mental impairments: poor hygiene, problems getting along with other people, angry outbursts, and temper tantrums." (*Id.*)

type instructions so long as he worked in a low stress environment." (Tr. 22.) Additionally, ALJ Letchworth considered Dr. Balger's report, noting that "Dr. Balger examined the claimant in 2000 and assessed him with dwarfism; mild anxiety; and autism with high-functioning abilities," and Dr. Balger's "follow-up note in 2002 shows that his parents reported to the physician that the claimant preferred not to take prescribed anti-psychotic medications." (Tr. 23.) As none of the medical opinions in the record assessed severe mental impairment limitations, ALJ Letchworth concluded that "no treating or examining source has offered an opinion disabling [Plaintiff]" (Tr. 23), and this conclusion was supported by substantial evidence.

In addition to the medical reports, ALJ Letchworth relied on the following in determining Plaintiff's RFC: (1) Plaintiff "apparently has worked at [substantial gainful activity] level despite his congenital dwarfism and long-term autism"; (2) Plaintiff "testified that he received *no special treatment or accommodations* in several long-term jobs"; (3) Plaintiff "has not attempted to obtain low or no-cost mental health therapy while in Tennessee"; and (4) Plaintiff "admitted that his electrician helper job ended in 2007 due to *lack of work* rather than for any medical or performance issues and asserted that he attempted to draw unemployment benefits after losing his job at Ryan's Restaurant and such would connote that he was willing, able, and available to look for and perform work activities." (*Id.*) Thus, ALJ Letchworth's RFC finding is based on substantial evidence and consistent with medical opinions in the record.

Second, despite Plaintiff's objection, ALJ Letchworth's RFC determination is consistent with the psychological evaluation performed in June 1994 by Barbara Sullivan. In making Plaintiff's RFC determination, ALJ Letchworth did not ignore Ms. Sullivan's report, noting that "a school psychological evaluation . . . was performed in June 1994. . . . The claimant was assessed with autism . . . [and] observed to exhibit difficulties with speech and language

14

communications and to respond inconsistently with sensory stimuli." (Tr. 22–23.) Despite

diagnosing Plaintiff with autism and finding that he had the interpersonal skills of a six-year-old

and the coping skills of a nine-year-old, Ms. Sullivan noted in her report that Plaintiff "is much

higher functioning than most individuals with autism," and that "his prognosis for the future may

be fairly good when [Plaintiff] is an adult." (Tr. 267.) Thus, Ms. Sullivan's report does not

contradict ALJ Letchworth's findings.

To the extent that Ms. Sullivan's opinion found Plaintiff's interpersonal and coping skills

limited, ALJ Letchworth properly relied on more recent medical evidence, as previously noted.

The Sixth Circuit has indicated that more recent medical evidence may discount an "outdated"

assessment by a treating physician. *See Hamblin v. Apfel*, 7 F. App'x 449, 451 (6th Cir. 2001)

(finding recent examinations of a claimant which showed improvement in the claimant's

condition discounted a treating physician's assessment that was five years old at the time of the

ALJ's determination). Given that Ms. Sullivan's report was over twelve years-old at the time

Plaintiff filed his DIB and SSI applications, and that Ms. Sullivan examined Plaintiff when he

was still in high school, ALJ Letchworth properly discounted her findings as to Plaintiff's

present interpersonal and coping skills in favor of more recent medical evidence.

Plaintiff correctly asserts that his work history suggests some limitation in his ability to

respond appropriately to supervision and coworkers. However, "[w]here substantial evidence

supports the Secretary's determination, it is conclusive, even if substantial evidence also supports

the opposite conclusion." *Crum*, 921 F.2d at 644. Because ALJ Letchworth's RFC

determination is supported by substantial evidence, his father's testimony in regard to Plaintiff's

work history is not sufficient to overcome the ALJ's finding.

Plaintiff admits his testimony reflects he was able to obtain employment on his own and did not receive special treatment while employed. (Doc. No. 12 at 8.) He asserts, however, that given his autism and general social functioning inabilities, ALJ Letchworth should not have taken Plaintiff's testimony at face value, and should have relied instead on Plaintiff's father's testimony and the report of his school psychologist, Ms. Sullivan. (*Id.*)

The Sixth Circuit gives great deference to an ALJ's findings regarding the credibility of a claimant's testimony, as long as the ALJ's credibility assessment is supported by substantial evidence. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

Here, while ALJ Letchworth discounted some of Plaintiff's subjective complaints,[5] he considered Plaintiff's testimony "that he received *no special treatment or accommodations* in several long-term jobs" in making his RFC determination. (Tr. 23.) ALJ Letchworth considered this testimony credible because "[t]he objective medical evidence of record shows that no treating or examining source has offered an opinion disabling [Plaintiff], and he has not attempted to obtain low or no-cost mental health therapy while in Tennessee." (*Id.*) As previously determined, ALJ Letchworth properly considered the medical evidence of record in determining Plaintiff's RFC, including Ms. Sullivan's report. As such, ALJ Letchworth's credibility determination is supported by substantial evidence, and the Court defers to ALJ Letchworth's determination of Plaintiff's credibility. Further, notwithstanding Plaintiff's testimony, ALJ Letchworth's RFC determination still has a sufficient evidentiary basis in the record, given its consistency with other objective medical evidence.

The Court therefore concludes ALJ Letchworth's RFC determination is supported by substantial evidence, and Plaintiff's objection on this ground fails.

---

[5] *See, e.g.*, Tr. 23 ("The degree of the claimant's complaints of pain is not considered fully credible.")

*B. ALJ Letchworth's Reliance on VE Testimony*

Next, Plaintiff argues that Magistrate Judge Knowles erred in concluding ALJ

Letchworth properly relied on VE Nadolsky's testimony that there are jobs that exist in

significant numbers in the national economy that Plaintiff can perform. (Doc. No. 16 at 6–8.)

When posed with a hypothetical claimant who is limited to direct and non-confrontational

supervision and no highly stressful production or quota rates, VE Nadolsky testified: "I think he

might have some difficulty getting through the initial phase of the job because of the need for

direct and non confrontational supervision." (Tr. 48.) Plaintiff argues that this statement renders

VE Nadolsky's testimony unclear as to whether Plaintiff could maintain steady employment.

(Doc. No. 16 at 7.) Thus, Plaintiff claims, because the Commissioner bears the burden of

identifying a significant number of jobs in the economy that accommodate Plaintiff's RFC, ALJ

Letchworth's determination should be reversed and remanded for additional VE testimony to

clarify whether Plaintiff can maintain steady employment. (Doc. No. 16 at 7–8 (citing *Felisky v.*

*Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).)

As noted above, at step five of the disability evaluation process, the ALJ determines

whether the claimant is able to do any other work. 20 C.F.R. §§ 404.1520(a), 416.920(a). At

this step, the Commissioner must provide evidence of the existence of a significant number of

jobs in the national economy that the claimant could perform, given his or her age, experience,

education, and RFC. *Id.*; *Moon*, 923 F.2d at 1181. If a claimant's RFC is restricted by

nonexertional limitations, as here, those "nonexertional limitations must be taken into account

and a non-guideline determination made." *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d

524, 528–29 (6th Cir. 1981). The ALJ may rely on VE testimony to prove the existence of a

substantial number of jobs, but the testimony must be given in response to a hypothetical

question that accurately describes the claimant and that is supported by substantial evidence in the record. *Felisky*, 35 F.3d at 1036; *Hardaway v. Sec'y of Health and Human Servs.*, 823 F.2d 922, 927 (6th Cir. 1987).

An ALJ may not rely on VE testimony if the expert is unable to testify without qualification about the jobs a claimant can perform. *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Graves v. Sec'y of Health, Educ. & Welfare*, 473 F.2d 807, 809–10 (6th Cir. 1973). In *Graves*, the court found that the hearing examiner improperly relied on VE testimony as to the number of jobs for which the claimant would qualify because the VE's further testimony "[made] this reliance unfounded, and an inadequate basis for his conclusion." 473 F.2d at 809. Initially, the VE testified that 750 to 1,000 jobs existed in the local area for which the claimant would qualify based on the hypothetical. *Id.* at 809 n.5. When asked if those jobs were available nationwide, however, the VE replied: "these positions are always going to be in a notable minority." *Id.* at 809. The VE further qualified the availability of jobs under later questioning, testifying "that only one-fourth or one-third of the employers who have these types of jobs hire people with physical handicaps," and "most employers discriminate in hiring older workers." *Id.*

VE Nadolsky's testimony in the case at hand is factually distinct from the VE testimony in *Graves*. The transcript from VE Nadolsky's testimony reads as follows:

> Q        Now, next hypothetical, Dr. Nadolsky, assume that in addition to what was provided in the first hypothetical[6] . . . let's

---

[6] The first hypothetical asked VE Nadolsky to:

> assume the claimant has no physical limitations, no exertional limitations. However, he is limited to performing no more than simple and low level detailed instructions, can have no more than occasional interaction with the public, will perform better in an object focused work setting than in a public setting, can adjust to occasional changes in work settings or routines. . . .

assume further that any supervision of the claimant must be direct and non confrontational [sic]. Let's assume further that the claimant can perform no highly stressful production rate or quota jobs.

A    I don't believe it would affect my answer to the hypothetical,[7] I think he might have some difficulty getting through the initial phase of the job because of the need for direct and non confrontational [sic] supervision. He may or may not have difficulty getting through the initial phase.

Q    Well, would there be any jobs that would accommodate the further requirement of direct and non confrontational [sic] supervision?

A    Yes, there would be many jobs, I think the kind of jobs that I testified to but he'd also be able to perform other jobs. Examples would be jobs such as hand sander, a cushion stuffer, a furniture wiper, a decal applier, a gasket inspector . . . In the light, in the local labor market at the light level there's about 1,100 of these kind of jobs and nationwide there's approximately one and one-half million.

(Tr. 48.)

The Court has already concluded ALJ Letchworth's RFC limiting Plaintiff to direct, non-confrontational supervision and to jobs that require no high stress production rates or quotes is supported by substantial evidence. *See supra* Part V.A. Thus, the hypothetical posed to VE Nadolsky accurately describes Plaintiff.

---

[L]et's assume the claimant has no past work experience. The claimant was born in December '75 so he's currently 34 years of age and has a high school education.

(Tr. 46–47.)

[7] In response to the first hypothetical, VE Nadolsky responded "there would be many jobs the person could perform at different levels . . . at the medium level he could perform jobs such as a conveyor feeder, a conveyor off-barrier . . . . he can perform the job as a packaging machine tender, could also work in some jobs as a cleaner, could definitely work as a mold cleaner." (Tr. 47.) VE Nadolsky concluded that "in the local labor market there's a total of about 800 medium jobs that the claimant could do . . . Nationwide there's about one and one-quarter million of the same types of jobs." (*Id.*)

In contrast to *Graves*, where the VE opined the number of available jobs before qualifying those jobs with percentages of employers that discriminate against physically handicapped and older workers, here VE Nadolsky testified to the number and kind of jobs *after* stating Plaintiff might have some difficulty in the initial stages of a job. The record reflects VE Nadolsky concluded there would be a significant number of jobs Plaintiff could perform, despite the need for direct and non-confrontational supervision, and any difficulties that come with it. He considered the potential difficulty in testifying to the type and number of jobs available, and as such, VE Nadolsky's testimony is not "qualified," as was the VE testimony in *Graves*. *See* 473 F.2d at 809–10.

Accordingly, ALJ Letchworth properly relied on VE Nadolsky's testimony in concluding that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

In his Objection, Plaintiff notes an unpublished case from the Eastern District of Michigan that cites a number of unpublished opinions from district courts outside of the Sixth Circuit, which he claims "support the contention that a limited ability to interact with co-workers and supervisors substantially erodes the occupational base, especially for unskilled work." (Doc. Nos. 16 at 7; 12 at 11–12 (citing *Boley v. Astrue*, No. 11-10896, 2012 WL 680393, at *12 (E.D. Mich. Feb. 10, 2012)).) In *Boley*, the court concluded that the ALJ erred in relying solely on the Medical-Vocational Guidelines in making a disability determination in light of the claimant's nonexertional limitations, and additionally found that the ALJ "should have received testimony of a vocational expert on the issue of whether [the nonexertional] limitations conflict with and significantly erode the occupational base." 2012 WL 680393, at *1–2.

In contrast to *Boley*, ALJ Letchworth explicitly relied on VE testimony "[t]o determine the extent to which [Plaintiff's nonexertional] limitations erode the occupational base of unskilled work at all exertional levels." (Tr. 24.) As such, the issue in *Boley* is not present in this case.

As ALJ Letchworth properly relied on VE Nadolsky's testimony in determining that Plaintiff can perform a substantial number of jobs in the national economy, his decision is supported by substantial evidence and Plaintiff's objection cannot stand.

## VI. CONCLUSION

The Court finds substantial evidence in the record supported the ALJ's decision and therefore **ADOPTS** the Report (Doc. No. 14) in its entirety. Plaintiff's Motion (Doc. No. 11) is **DENIED** and decision of the Commissioner is **AFFIRMED**. The case is hereby **DISMISSED**. The Clerk of the Court is **DIRECTED** to close the case.

It is so ORDERED.

Entered this the ___ day of July 2014.

JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT

21